## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

1:22-cv-00589
Judge Norgle
Magistrate Judge Jantz
Cat 2 / Random

Lionell  Kline  )

Plaintiff  )

v.  )

United Airlines, Inc.  )

Defendant(s)

**RECEIVED**

**JAN 3 1 2022** CR

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

### COMPLAINT OF EMPLOYMENT DISCRIMINATION

Defendant United Airlines failed to take any action regarding Plaintiff complaints. Plaintiff filed

an EEOC charge 21B-2013-01875, with US Equal Employment Opportunity Commission.

Pursuant to Title VII, the Americans with Disability Act, the Genetic Information

Nondiscrimination Act, or the Age Discrimination in Employment.

Plaintiff has filed this cause pursuant to the November 12, 2021 letter EEOC issued a Notice of

Right To Sue Letter  which states **"Your lawsuit must be filed  _WITHIN 90 DAYS_  of your

receipt of this notice; or your right to sue based on this charge will be lost.  See** attached

hereto as (**Exhibit A),**

This is an enforcement action to correct the unlawful employment practice of the Defendant

retaliation and age discrimination in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §2000*e.et.seq.*("Title VII"), and Title I of the Civil Rights Act of 1991, 42

U.S.C. § 1981a, discrimination against him for making an internal complaint of discrimination;





in violation of the Working Together Guidelines (WTG). Pursuant to the Age Discrimination in Employment Act of 1967. **ADEA, 29 U.S.C.A.** §§621 et seq and pursuant to 28 U.S.C.A. §§1343(4).

Since November 16, 2006 the Defendant has engaged in unlawful retaliatory practices in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) by terminating the 25 year employment of Mr. Lionell Kline (50 year old, African American) male.  He was assaulted by a white male, 37 year old who was given instructions by a white supervisor to assist Lead Ramp Serviceman Lionell Kline dispatching aircraft and assisting on Gate B-9.

 This action seeks to provide appropriate relief to Lionell Kline who was adversely affected by such practice and opposed discriminatory practices/ hostile work environment.

I, Lionell Kline, having personal knowledge of the facts attested to herein, declare the following:

1. I reside at 9212 S. Essex Ave, Chicago, Illinois 60617.

2. I was employed by United Airlines, Inc. ("UAL") from December 13, 1987 to May 30, 2013. I received a "Silver Veteran's Badge" from my union recognizing my twenty-five (25) years of loyalty and faithful service.

3. During the entire time of my employment, I was a member of the International Association of Machinist and Aerospace Workers, District Lodge 141 and Local Lodge 1487 (collectively "Union"). At the time of the wrongful termination, my job title was "Lead Ramp Serviceman," the highest non-management level union position in the Ramp Service. The duties of a Lead Ramp Serviceman included

2

leading and directing the work of other employees of lower classifications and I was often required to give instruction and training to employees of the same or lower classification.

4.  I was furloughed to Los Angeles, California from February 16, 1992 to September 26, 1999.  On May 4, 1995, I was promoted from working as an airfreight Ramp Serviceman to Lead Ramp Serviceman on the ramp. 'During that time I was chosen to be a panel member on Shuttle Mentorship Program that included Pilots, Flight Attendants, Ramp and Customer Service Representatives. We traveled from various Shuttle stations describing our job functions to other United employees. I was privileged to open-up the first shuttle gate in Denver Colorado.

5.  On September 26, 1999 I transferred back to United Airlines O'Hare Airport due to the racist and hostile working environment while working on the ramp in Los Angeles.

6.  On January 12, 2013,  while working on the ramp at Gate B-9 at O'Hare International Airport, bringing in an aircraft into  gate B9,  I was suddenly shoved from behind; unprovoked and for no apparent reason, by Daniel Loner, a white male that was assigned temporarily to dispatch flights from Gate B-9 due to lack of qualified staff.   I was bringing in the aircraft into the gate with an Acupark (the Acupark has three (3)  colored buttons, RED for STOP, YELLOW for

3

CAUTION, GREEN for GO).The Acupark is coordinated with the same color

scheme on the terminal building at the gate so that the Pilots can see how to taxi

into the gate area.   Loner had just pushed a plane out from gate B-9 with the

pushback tractor that was borrowed from gate B-10. Daniel Loner pushed me so

hard I dropped the Acupark device from my hand the plane immediately came to

an abrupt stop and I fell down to one knee, I had to release the Acupark.  I called

for the Zone 1 supervisor Emilio Contreras but there was no response. Because

half of the rear of the plane was sticking out between the B & C concourse I

immediately resumed bringing in the plane into the gate area so it would not be

struck by other aircraft passing through "ramp roadway".  After I chalked the

front wheels and the engines spooled down I yelled at Loner "what in the hell is

your problem?".  He ignored me and walked away to gate B-10 and talked to Gate

Lead Gregory Bellizzi. I was traumatized by this horrible assault and battery

feeling sick to my stomach and could not believe that this assault had happened to

me. My thought was I knew it was captured on the cameras and the pilots would

say something because the plane stopped abruptly. There was no response to my

call to Emilio on the radio from control and I waited for a response from someone

that just witnessed this! I was in utter disbelief!  My surroundings became a blur;

I felt dizzy and after contacting Emilio and he didn't respond. I left work early.

7. No action was taken by United Airlines against Daniel Loner for the assault

Daniel Loner never attended any of the investigative hearings. He never met face-

to-face with IDHR investigator Nancy Styles. Hoornstra and Emilio sheltered

Daniel Loner from ever being interviewed by Investigator Stiles and during

hearings on May 30 and November 26 2013. **A continuation of intentional**

**inflection of emotional distress.**

 The assault by Daniel Loner aggravated a prior work injury causing pain to my right

arm, shoulder, back and side. A surveillance video of the assault and battery was

produced by UAL. On the January 21, 2014, (10:00am) Emilio brought his

computer with video of the Dan Loner **assault** on January 12, 2013 to Nancy Stiles;

Emilio was accompanied by Robin Hoornstra. Investigator Stiles requested copies of

the videos which Hoornstra provided clearly showing that Daniel Loner assaulted

Lionell Kline.   Contreras, my supervisor witnessed the assault; the video revealed

Contreras standing in a corner where he had full view of the assault. He failed to

complete the required1845 incident report and failed to file a **Violence Free**

**Workplace Incident Report under the provisions of Sky Net.** See **(Exhibit B)**

Emilio failed to file a report on Daniel Loner for impersonating a mechanic's wearing

an orange mechanic vest and not wearing a uniform in accordance with the Working

Together Guidelines (WTG) and the Collective Bargaining Agreement (CBA).

5

On January 16, 2013, prior to going to my scheduled medical appointment I detailed the assault incident to Emilio Contreras including potential witnesses (Fueler, Baggage handlers, jet bridge driver, pilots-of-aircraft, bus driver and passengers). Gate B-9 is across from the employee bus stop. Emilio Contreras, Elaine Arizmendi, and I had the same off-day schedule. The trauma experience aggravated previous work related injuries and caused infliction of emotional distress; headache, neck, back, arm and lower back pain, sleeplessness, loss of appetite and nightmare.

On July 29, 2011 at 5:50am as I was walking from my vehicle to the employee bus stop I was run-over, knocked approximately 10 fee in the air ; my right show was knocked off it was knocked off about 20 feet away from me by Pilot Kevin Thomas an United Express (UAX) in the employee's parking lot. The employee bus was parked, employees were being loaded on the bus' no-one on that bus stopped to help me. Kevin Thomas parked his vehicle in the back of the parking lot and finally walked up to me and said **"WHAT HAPPENED?" "I said you hit me"** he said "I thought I hit a piece of card-board. *Said "I'm a little heavier than a piece of card-board.*

Around 6:15am Ramp Manager Ed Cox and Safety Supervisor Frank Wyzkowski showed up and I explained to them what happened. They told me to get into the company SUV to go to medical. Once I placed my work bag in the rear seat of the SUV they said they got a call and had to go back to the ramp and left me in parking lot next to a concrete pillar. About 6:20

6

a.m. they came back and only ONE Chicago O'Hare Police showed up and wrote up the report. Ed Cox and Frank Wyzkowski were more concerned about Kevin Thomas making his UAX flight and failed to give him a drug test; they let him go in violation of UAL, FAA and OSHA rules. The police officer retired the next day. I was taken to Resurrection Hospital Emergency; X-Rays were taken; I was treated and later released to go home.

8. On January 16, 2013, Emilio said "we will meet back here on the 19th and will do an investigation". Emilio had not completed the required 1845 incident report; he said he would complete the 1845 incident report on January 19, 2013 and start the investigation at the same time. I found out later that Dan Loner had been interviewed at 6am on January 19, 2013 before Elaine and me. Loner was given privilege again and again; never being in view within any meeting or co-workers assembly and never in my view. On January 20, 2013, I contacted and filed a complaint with the O'Hare Chicago Police Department Unit(CPDU) they wrote a report and told me the next time I saw Loner to call them. On January 21, 2013 I saw Loner in the B Concourse walking with supervisor Jay Gegenhemier and Paul Dommino Loner's gate Lead. I called the CPD and Daniel Loner was arrested. The CPD told me to call my Union. See attached February 19, 2013 letter from Emilio to Loner dated **(Exhibit C )**

7

9. I went downstairs to my gate kiosk and called the union and spoke to union

representative Art Swartz and was interrupted by union steward Mike Ciscon.

When I attempted to tell him what the police said he started yelling. I said Daniel

Loner was being arrested for assault and he said "alleged assault " I said he

pushed me in front of the airplane he started cursing me out so loud my coworkers

heard him yelling through the phone I was so embarrassed I hung up the phone.

This assault shocked me and I was traumatized day and night by the thought of Loner

pushing me in front of that moving plane. Due to the dizziness, pain, emotional

distress, shock and trauma, I had originally reported the date of the assault as January

14, 2013. However, I later came to realize that the assault had taken place on January

12, 2013 and I corrected the date.

When the Union and UAL began an investigation into the assault claim, UAL created

an investigation file. After a review of the Investigation file it showed no adequately

detailed report of Daniel Loner. There are no flight details, i.e. flight number , nose

number, pilot and copilot , flight crew, jet-bridge driver. Names of any and all

witnesses that were interviewed. This is a violation of the Federal Aviation

Administration (FAA). The CBA requires an accident or incident must be reported

within 24 hours of incident. Safety supervisor Frank Wyzykowski didn't interview

me about the assault until January 30, 2013 (24) days after UAL was informed of the

8

assault by Daniel Loner.

10. When the Union and UAL began an investigation into the assault claim, UAL created an investigative file.

11. As a part of the Union's investigation, I gave a written statement. However, a review of the investigation file shows no written statement from Daniel Loner or any adequately detailed report of the interview of Daniel Loner. Daniel Loner is a Caucasian; I am an African American male.

12. My crew member Elaine Arizmendi was working at Gate B-9 and witnessed the assault. Ms. Arizmendi gave Emilio Contreras a written statement confirming that I was pushed by Daniel Loner. Attached as **(Exhibit D)** is a hand-written statement of Ms. Arizmendi and statements from her IDHR file which is part of the investigation file.

13. Ms. Arizmendi was forced **5 (five) times by** male supervisors to recant her original statement or be fired. Ms. Arizmendi stated to the Nancy Styles investigator for the Illinois Department of Human Rights (IDHR) that she was threatened by Emilio Contreras and five (5) other male supervisors that if she did not recant her testimony that she would be fired. Ms. Arizmendi recanted her testimony and four days after I was wrongfully terminated, she was wrongfully terminated. This was a malicious and willful intent conspired against a female and

male considered to me a minority people of color (Ms. Arizmendi of Hispanic decent and Kline being African-American). They (Emilio and the other supervisors) knew that Ms. Arizmendi was **Bio-polar.** However, the Investigative File did not contain any evidence that the Union investigated why Ms. Arizmendi suddenly recanted her witness statement. in such an unusual way.

14. A review of the Investigative File also indicates that the following reasonable and necessary tasks were not performed by the Union in investigating that the assault and ultimately in challenging my termination.

15. In addition, none of these reports were included in my personnel filed released to me in recent "Fact" "Discovery" process. In fact during deposition Rule 30 (b)(6) Marc Vicary United's chosen "Representative" held 191 pages from my personnel file that United withheld and stating to the Court that they had provided to me all of my personnel files.

- No supervisor report from Emilio. No ORD incident report

- No follow-up to find other surveillance camera views of the assault

- No forensic analysis of the videotapes provided to ensure absence of tampering

- No investigation to find eye-witnesses, the airplane passengers and crew who may have witnessed the assault

10

- No detailed written statement from the assailant Daniel Loner

- No investigation as to why Ms. Arizmendi recanted her original statement that I was indeed pushed by Daniel Loner

- No "OIR" Occupational Injury Report

- No OSHA Injury Report

- NO SkyNet Corporate Security–Violence Free Workplace Incident report
  **(Exhibit B)**

16. UAL determined that there was insufficient evidence to establish that the result in question had occurred. However, rather than simply concluding the investigation as an unresolved "he said – she said" factual dispute, UAL deemed the assault claim to be a fabrication and, on May 6, 2013, UAL recommended that my employment be terminated.

17. At the time of UAL's proposal for termination, and prior to and all relevant times subsequent hereto, UAL and the Union were parties to a binding collective bargaining agreement (CBA).

18. The CBA although given a four year term in its title (2005-2009), is automatically renewed annually after the year 2009 without change unless the stated procedure for the change or termination triggered by either party.

19. In regard to disciplinary action and the opportunity for an employee to challenge

11

what he believes to be a wrongful termination, the CBA provides in pertinent part as follows.

20.

ARTICLE VII DISCIPILNARY ACTION

B. No employee shall be discharged without a prompt, fair and
Impartial investigative hearing at which he may be represented
And assisted by Union Representatives. An employee will also be
assisted by Union Representatives. An employee will also be
entitled to an investigative review hearing if he so requests upon
being advised of a disciplinary suspension. The hearing will be
held before any suspension is served. Prior to the actual hearing
the Union and employee will be given copies of any previous
 disciplinary action letters which are to be considered and the Union
will be advised in writing of the previse charges against the
employee. The Union and employee will have at least forty-eight
(48) hours advance notification of the hearing should they so desire.
Nothing herein shall be construed as preventing the Company from
Holding an employee out of service pending such investigation.
{emphasis added}
E. If, as a result of any hearing or appeals therefrom, it is found
the suspension or discharge was not justified,,, the employee shall
be reinstated without loss of seniority and made whole for any loss
of pay he suffered by reason of his suspension or discharge, and his
personnel record shall be corrected and cleared of such charges; or,
if a suspension rather than discharge results, the employee shall
have that time he was held out of service credited against his period
of suspension.. In determining the amount of back wages due an
employee who is reinstated as a result of procedures outlined in
this Agreement, the maximum liability of the Company shall be
limited to the amount of normal wages he would have earned in
the service of the Company had he not been discharged or suspended.
{emphasis added}

The CBA also includes a mandatory grievance procedure. The relevant terms of the Grievance Procedure found on pages 51 through 55 of the CBA. The Grievance Procedure list four steps. To the extent the grievance is not settled after the three step in the process, the procedure allows the Union to seek a "Step Four" hearing before the "system board of adjustment" consisting of a neutral chairman, a company representative and a Union representative. The Step Four procedure provides in pertinent parts as follows:

H. Step Four—System Board
If the grievance remains unsettled after being processed through
Step 3 above, the System General Chairman may request the case
Heard by the System Board in compliance with Section 204, Title
II of the Railway Labor Act as amended.

12

The System Board of Adjustment shall consist of three members
Members, the CHAIRMAN, who will be a neutral member selected
In a manner agreeable to the Company and the Union, the COMPANY
MEMBER, who will be appointed by the Company and the UNION
MEMBER, who will be appointed by the Union.

21. At the time of UAL's proposal for termination, and prior to and at all relevant
times subsequent hereto, there was in effect a booklet issued by the Union, District Lodge
141, outlining grievance procedures or the benefit of Union members and the shop
stewards who manage the process. A true and correct copy of the "Grievance Procedure
for Shop Stewards," which I received from the Union.
This booklet was published and distributed by District Lodge 141
The Grievance Procedure for Shop Stewards provides that those involved in the Second
Step Hearing include "Union Witness' the Booklet also provides that one purpose of the
grievance is to "Put the strength and skill of the IAM [Union] behind each worker with a
legitimate grievance.

22. In response to UAL's termination proposal, I requested a grievance hearing as
provided for by the Grievance Procedure in the CBA.

23. My objection to UAL's termination proposal was not resolved at the "Step One"
level of the "Grievance Procedure.

24. At the "Step Two" level, a hearing was held on May 30, 2013. The decision from
that hearing, which I received and kept in a file. At the time of the Step Two
hearing, I was represented by the Union. At that time the Union was aware that I
faced possible termination due to UAL's challenge to the veracity of my claim of
assault. At the hearing the Company provided 10 exhibits outlining and
supporting their position; the Union provided 1 exhibit outlining and supporting
their position. Despite the fact that the Grievance Procedure for Shop Stewards
allows for "Unions Witnesses," the Union called no witnesses on my behalf. The
Hearing Officer found in favor of UAL and terminated my employment with
UAL effective May 30, 2013.

25. At the time of my termination, I was earning $22.45 per hour and was covered by
a health insurance program. UAL did not provide an Exit interview did not provide
one piece of paper on my health insurance that covered me that I had earned. Family
(5 children) was canceled on May 29, 2013, a day before the May 30, 2013
termination date. UAL provided no information on the Consolidated Omnibus But
Reconciliation Act (COBRA)

26. Following my termination, the Union sought a Step Three hearing. A step three hearing took place on November 26, 2013.

27. On January 22, 2014, the Union confirmed by letter that my Step Three appeal had been denied. I was further advised in that letter that the Union determined that further appeal would not be successful at the System Board of Adjustment [a/k/a "Step Four hearing"]. Other than to state that the Union had examined my case and had reviewed past disciplinary cases. I had not received any disciplinary actions; the Union did not elaborate on the basis of its determination not to seek Step Four hearing on my behalf. Additionally, neither Mr. Stenberg nor any other Union representative had contacted me to discuss the merits of a Step Four hearing before declining to do so.

27. My further requests to the Union to seek a Step Four hearing on my behalf went unanswered.

28. In the grievance process, I relied completely upon the Union (which has far greater experience in the process) to investigate and submit necessary evidence to challenge my termination. The Union failed to investigate and represent me.

29. The Union, and Mr. Stenberg, failed to perform the following minimally necessary tasks to comply with the Union's obligation to provide good faith and adequate representation of my interest at the grievance hearings challenging my termination.

- Failed to call any witnesses at the Step Two hearing on May 30, 2013;
- Introduced only one exhibit at the Step Two hearing on May 30, 2013;
- Failed to call the assailant Daniel Loner – as a witness at either Step Two hearing (5-30-13) or the Step Three hearing on November 26, 2013;
- Failed to seek a Step Four hearing despite the severe nature of the disciplinary action taken against me by UAL – termination and consider my 25 years of service.

30. The failure of the Union to provide good faith and adequate representation prevented my reinstatement as an employee of UAL. Reinstatement is a form of relief

14

specifically to an employee who successfully challenges his termination via the Grievance Procedure. As cited above from the CBA:

> 'If, as a result of any hearing appeals therefrom, it is found
> The suspension or discharge was not justified, the employee
> Shall be reinstated without loss of seniority and made whole
> for any loss of pay he suffered by reason of his suspension or
> discharge, and his personal records shall be corrected and cleared
> of such charge..."

At the close of the May 30, 2013 hearing I was immediately escorted by the Union to the B side of the lower concourse. I never received an exit interview; that usually includes package of booklets describing insurance, 401-K, extended benefits COBRA,ERISA, and unemployment procedures and other information. This was an intention inflection of emotional distress  In additional, per 2005-2009 CBA Agreement I am still owed:

- Retro Pay and Signing Bonus – Article XXI (G), Page 62
- Vacation pay and Holiday Pay

Daniel Loner has been  hidden, he was never at any of the hearings in view.  He has been hidden from making his Oscar appearance. There are pictures of the assault, but no-one will admit to it.  However, Emilio and Robin Hoornstra and Jay had an appointment with Nancy Stiles, Investigator at the Illinois  Department of Human Rights.  Emilio arrived with his computer and showed Nancy the video footage. Nancy requested pictures of Daniel raising his hands up and touching me. But no one has seen that video on the date of January 12, 2013. Everybody disputes that Loner pushed me in front of an aircraft.- I could have been dead. My five children could have been fatherless and my parents could not any great-grand children to hug.  Some people said that Loner was really a good person and had "kids" to take care of; but I never heard from the chit-chat that Lionell Kline had five kids including a few that were in community college and had great potential for being a president in the future.

### EMPLOYEES TREATED DIFFERENTLY THAN LIONELL KLINE:

1.  Charles Edwards , Lead Ramp serviceman (Black) Fired, Reinstated went to Arbitration
2.  Mike KcCabe, Ramp Serviceman (white), Fired, reinstated

3. Marvin Lawson, Lead Ramp Serviceman (Black) Fired retired with full benefits

4. Kevin Cremble Ramp Serviceman (Black) fired; retired with full benefits

5. Billy Quenica Lead Ramp Service (White) Fired, retired with full benefits

6. Kip Dalke Lead Ramp Serviceman (white), fired and reinstated

7. Larry Thompson  (white) Lead Ramp Serviceman; Shop Steward; fired with full benefits

8. Linda Thompson (White) Ramp serviceman Taken out of service and reinstated

**(EXHIBIT E – IDHR INVESTIGATION FILE)**

Pursuant to 28 U. S. C. § 1746, I declare on the penalty of perjury on the laws of the United States of America that the foregoing is true and correct.

LIONELL KLINE

DATED; January 28, 2022

9212 S. Essex Ave.

Chicago, IL 60617

# EXHIBIT A

# INDEX

1. Right to Sue Letter – November 2, 2021
2. Skynet: Corporate Security Security – Violance Free Work Place
3. Emilio's Letter to Daniel Loner – February 19, 2013
4. Elaine Arizmendi  Statements
5. IDHR Documents of Investigator Nancy Styles

EEOC Form 161 (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

**EXHIBIT #** _____

| To: | Lionell Kline<br>9212 S. Essex Avenue<br>Chicago, IL 60617 | From: | Chicago District Office<br>230 S. Dearborn<br>Suite 1866<br>Chicago, IL 60604 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 21B-2013-01875 | Daniel Lim,<br>State & Local Coordinator | (312) 872-9669 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Julianne Bowman/jwa*

11/2/2021

Julianne Bowman,
**District Director**

*(Date Issued)*

Enclosures(s)

cc:

**UNITED AIRLINES**
c/o Robin Hoomstra / EEO Compliance
233 S. Wacker Drive
Chicago, IL 60606

# EXHIBIT B

Case: 1:22-cv-00589 Document #: 1 Filed: 01/31/22 Page 21 of 56 PageID #:21

# Violence Free Workplace

## Policy Statement

United Airlines is committed to providing a work environment that is free from acts and/or threats of violence. We recognize that our co-workers face some significant challenges every day when they report to work, but dealing with threats and physical violence should not be one of them. United Airlines will not tolerate any form of violence and/or threat of violence in our workplaces or to co-workers as they perform their work duties. We believe that all co-workers have a basic right to be safe and secure in the workplace. The Company will not tolerate any behavior which endangers the safety of its co-workers or customers.

Co-workers who violate this policy may be subject to disciplinary action, up to and including discharge. Customers and other non-co-workers are also subject to this policy while on United Airlines' premises or otherwise interacting with United Airlines co-workers during the course of, or as a result of, performing their work duties.

Co-workers should report any threat or act of violence against themselves, other co-workers or customers that occur in the workplace (that could occur on the ground or in the air), in surrounding parking facilities, in off-site working environments, or at any other work-related site or location.

## Definition of Workplace Violence

Workplace violence is defined as any physical assault or threat of assault occurring in the workplace or as a result of carrying out work-related duties. An assault is any action that creates, or attempts to create, bodily harm or involves physical contact of a threatening nature. Threats are defined as any statements, verbal or written, that can be interpreted as intimidating or which place a person or the company in reasonable apprehension of harm to their person or property. Abusive or suggestive language which does not create the threat of violence or harm, even though it may be offensive, is not considered an assault for the purposes of Workplace Violence. Workplace violence also may include the destruction or abuse of property through vandalism, arson, sabotage, or other means.

## Three Types of Workplace Violence

### Violence by Strangers

In this category, violence is committed by a stranger. This stranger has no legitimate relationship to the co-worker or the workplace and may enter the workplace on the pretense of being a customer or vendor. This category of victimization also applies if a co-worker is confronted by a stranger outside a traditional workplace but while acting within the course and scope of his/her employment responsibilities.

### Violence by Co-Workers

In this category, violence is committed by an individual who has or has had an employment relationship with the company. This individual may be a current or former Co-worker. Co-worker violence that occurs outside the workplace, but which arose from the employment relationship, may also be included in this category, as would violence between supervisors and subordinates.

### Violence Caused by Personal Relationships

This type of violence is committed in the workplace by someone who has or had a personal relationship with the co-worker. This may include but is not limited to a current or former spouse or partner, relative or friend. This category may also include situations which involve "domestic violence" and abuse and/or stalking.

## Assaults on Co-workers

It is United's policy that assaults will not be tolerated, and any co-worker who is subjected to an assault while at work will receive Company support including paid absence to appear in court during a related criminal proceeding.

Legally speaking, assault is an action taken toward an individual that creates a threat of bodily harm, or the apprehension of physical injury. Abusive or suggestive language, if it is not utilized in a manner that creates the threat of violence or harm, is not considered an assault. If physical contact should occur, the incident is defined as battery. As a practical matter, however, any event involving an assault or battery is generally referred to as an assault however this could vary from state to state.

Crew interference is governed by federal regulation (FAR 121.580). Crew interference is defined as an incident where a passenger assaults, threatens, intimidates or interferes with a crewmember while in the performance of crew duties aboard an aircraft.

United flight and cabin crews have experienced incidents of interference by customers on United flights. These incidents may

require law enforcement personnel to be called to meet the flight to obtain crew and passenger statements and pursue criminal charges, and some were even serious enough to be classified as assaults upon co-workers.

In most cases the co-workers elected not to press charges against the offending customer either because the situation was resolved to the co-worker's satisfaction without remedial action, or because the co-worker felt the Company should file the appropriate charges. Unfortunately the law does not allow the Company to file criminal assault charges on behalf of the co-worker in these cases.

When a co-worker has been assaulted and law enforcement has been called, the law may require that the actual person assaulted file and sign the complaint, not United Airlines, since the offense is against an individual and not the Company. United will support the co-worker's decision, but the law requires that the person assaulted sign the complaint and may require testimony in court at a later date. Such a decision, therefore, does require a commitment by the co-worker and should be taken seriously.

The Company will allow any co-worker who is subjected to abuse, physical violence or intimidation on the job the time to pursue appropriate criminal remedial action in accordance with state and local law.

The decision whether to pursue a civil action against a party who has committed an assault or battery belongs to the co-worker. A civil action is brought for the purpose of recovering damages, and anyone bringing such an action must show actual damages. Such an action is only available to the injured co-worker and United cannot be a party in such an action or provide legal representation to the co-worker. United will, however, support the co-worker, counsel him or her as to their rights, and provide a reference for an attorney if needed.

If a co-worker is assaulted, assistance is available 24/7 by calling the Corporate Security Desk (located in the Network Operations Center – NOC)at Unitel 700 4643 (847 700-4643)

It is important that co-workers report assaults to the Company. All reports receive follow up by Corporate Security. All reports of crew interference received by United's Corporate Security are filed with the FAA for recording and appropriate action. Additional reports obtained from local law enforcement agencies, and witness statements to include names and addresses, are attached to the crew reports to assist the FAA in their investigation and assignment of appropriate penalty action.

It is important to obtain as much information about the offender as possible. A name and address, seat number, as well as witness statements, are valuable. At a minimum, a description of the attacker, including physical characteristics, will be important when pursuing legal action.

## Co-worker Responsibilities and Steps to Report Incidents

All United Airlines personnel are responsible for notifying their immediate supervisor or department manager if they have been subjected to, or have been a witness to, any act or threat of workplace violence. United Airlines co-workers must report these incidents regardless of the nature of the relationship between the individual who initiated the threat and/or violence and the individual(s) who was the focus of the threat and/or violence. If the co-workers immediate supervisor and/or department manager is not available or is the initiator of the threat and/or violence, the co-worker should contact a Human Resources Representative, a Labor Relations Representative, or any other member of United Airlines management. If the co-worker is injured, he/she should also immediately request appropriate medical attention.

Any co-worker faced with an **imminent threat of violence or violence is occurring while at work** should:

- Attempt to physically separate from the threat.
- If possible, the co-workers should call the local police immediately and provide law enforcement with key information about the incident or notify the supervisor on duty who will request assistance from the local police.
- Notify the supervisor if you have already called the police.
- Call the local security department, during normal business hours, where applicable
- Call the Corporate Security Desk (24/7 located in the NOC) at Unitel 700-4643 (847 700-4643) as soon as possible after the incident.
- Complete the online VIWP Incident Report on the Corporate Security Flying Together site (see link below).

**Flying Together --> Corporate Security --> Violence Free Workplace Form**

Once the report is submitted, WHQSE will assign a case reference number and forward a copy to the co-worker's supervisor or manager.

Any co-worker who is facing workplace violence that is **NOT IMMINENT** should:

- Notify their supervisor
- Call the local security department, during normal business hours, where applicable
- Call the Corporate Security Desk (24/7 located in the NOC) to report at Unitel 700 4643 (847 700-4643)
- Complete the online VIWP Incident Report on the Corporate Security Flying Together site (see link below).

**Flying Together --> Corporate Security --> Violence Free Workplace Form**

Once the report is submitted, WHQSE will assign a case reference number and forward a copy to the co-worker's supervisor or manager.

## Management Responsibilities and Steps to Report Incidents

When a management co-worker becomes aware that an act of physical violence is occurring, or has occurred, he/she must, if appropriate:

- Call the local police immediately
- Secure and/or evacuate the area
- Coordinate medical assistance for the victim(s);
- Notify appropriate management (if applicable HR Labor Relations Rep, EAP, Legal, Ethic and Compliance)
- Notify the Threat Assessment Team (TAT) by contacting Corporate Security (WHQSE) at 847-700-4190 24/7 who will advise a TAT team member
- Plan and conduct an incident investigation
- Complete the online VIWP Incident Report on the Corporate Security Flying Together site (see link below).

**Flying Together --> Corporate Security --> Violence Free Workplace Form**

Once the report is submitted, WHQSE will assign a case reference number and forward a copy to the co-worker's supervisor or manager.

Management may also need to:

- Ensure that victims and witnesses receive additional medical and/or psychological assistance, if required
- Warn other potential targets
- Coordinate with law enforcement
- Pursue appropriate disciplinary remedies

When a management co-worker receives a complaint or otherwise becomes aware of an act of workplace violence that is **NOT IMMINENT** but that, in his/her judgment poses a threat to United Airlines, he/she must, if appropriate:

- Document the incident
- Plan and conduct an investigation of the incident
- Attempt to satisfactorily resolve the situation at the local level
- Pursue appropriate disciplinary remedies
- Complete the online VIWP Incident Report on the Corporate Security Flying Together site (see link below).

**Flying Together --> Corporate Security --> Violence Free Workplace Form**

Once the report is submitted, WHQSE will assign a case reference number and forward a copy to the co-worker's supervisor or manager.

If the incident is NOT resolved on the local level, the management co-worker must:

- Notify appropriate management
- Consult a People Services or Labor Relations Representative
- Contact United Airlines TAT Team Through WHQSE at 847-700-4190 24/7 who will advise a TAT team member
- Complete the online VIWP Incident Report on the Corporate Security Flying Together site (see link below).

**Flying Together --> Corporate Security --> Violence Free Workplace Form**

Once the report is submitted, WHQSE will assign a case reference number and forward a copy to the co-worker's supervisor or manager.

## Documentation

Management documentation should include records of all interviews, conversations, and investigative reports. The purpose of the documentation is to maintain accurate and accessible records. Incidents will be reported in a standardized format.

## Debriefing

Case: 1:22-cv-00589 Document #: 1 Filed: 01/31/22 Page 24 of 56 PageID #:24

It may be appropriate for Corporate Security to hold a debriefing of key parties involved in an incident. The purpose of this is to learn from the incident as a way of more effectively preventing future workplace violence.

## Confidentiality

It is the intention of United Airlines to maintain confidentiality for all reported incidents and the documents and interviews associated with such incidents. No information will be shared with anyone other than security staff, appropriate members of management, or those who have a legitimate need to know.

Confidentiality will be maintained beyond the conclusion of an incident.

## Program Awareness

WHQSE will be responsible for informing appropriate workforce members of the company's workplace violence program, statistics, requirements, trends, and matters that may affect a violence free work environment. WHQSE is the primary consultative internal unit that is responsible for evaluating the risk potential of any actual or potential work place threat or incident.

Last updated: September 12, 2012 4:47 PM
Author: Romel Aganon

Template: Generic

```
UPDGAT   ORD/ 22JAN/    ALL/ AD/    B9/ __/ __/ __/ 0000-2400/
UNASN:      0       CURRENT FLIGHT-GATE INFORMATION
    FLT   A/D  TIME  GATE  ZONE  BANK  CS  P/N   STA STATUS
    509    A   2312   B9   /  01/   __/  01/ 4661  DEN
```

222002Z AGENT L K ID 017616 FROM PID 046127 TO PID 108083

```
DSPNOT TITLE:/ 1845               /LET TYPE/   / EFFDTE:/ 012213
AUTHOR: /KLINE.LIONELL            /ADDRS /ORDCG /EXPDTE:/ 020513
                                                                *
                                                                *
MR CONTRERAS..COULD YOU SUBMIT MY 1845 FROM THE ASSUALT         *
ON 1/14/13. AS BEFORE MENTIONED I WENT TO THE DOCTOR            *
1/16/13 AND GALLAGHER BASSETT HAS NOT APPROVED THE MRI          *
TEST  YET. PERHAPS IF YOU WOULD SUBMIT THE WORKMANS             *
COMP CASE INFORMATION I COULD GO AHEAD AND BE TREATED           *
                                                                *
                          SINCERLY                              *
                                                                *
                    LDRSM LIONELL KLINE                         *
                                                                *
```

END OF LETTER

222003Z AGENT L K ID 017616 FROM PID 046127 TO PID 108083

```
DSPNOT TITLE:/ 1845               /LET TYPE/   / EFFDTE:/ 012213
AUTHOR: /KLINE.LIONELL            /ADDRS /ORDCG /EXPDTE:/ 020513
                                                                *
                                                                *
MR CONTRERAS..COULD YOU SUBMIT MY 1845 FROM THE ASSUALT         *
ON 1/14/13. AS BEFORE MENTIONED I WENT TO THE DOCTOR            *
1/16/13 AND GALLAGHER BASSETT HAS NOT APPROVED THE MRI          *
TEST  YET. PERHAPS IF YOU WOULD SUBMIT THE WORKMANS             *
COMP CASE INFORMATION I COULD GO AHEAD AND BE TREATED           *
                                                                *
                          SINCERLY                              *
                                                                *
                    LDRSM LIONELL KLINE                         *
                                                                *
```

LETTER

222003Z AGENT L K ID 017616 FROM PID 046127 TO PID 108083

# EXHIBIT C



EXHIBIT

#_____

February 19, 2013

Dan Loner
ORDCG
ID#192713

EIM#695720

Dear Dan:

As you know, we recently received a complaint from Lead RSM Lionell Kline that you engaged in inappropriate conduct in the workplace. Specifically, your co-worker alleged that you assaulted him when you pushed him.

United takes seriously its commitment to fair employment practices and will not tolerate inappropriate workplace behavior. In keeping with this commitment and in response to the allegations made against you, I initiated an investigation into your co-workers claim. The investigation is now complete.

United expects all employees to communicate and perform their duties in a courteous, helpful, competent, dependable and businesslike manner. All employees are also expected to treat each other with dignity and respect. In my investigation, I was unable to substantiate the allegation against you.

United Airlines policy on confidentiality regarding Company investigations applies to all parties concerned, including you and any persons contacted during the course of the investigation. The investigation should only be discussed with those persons who have a legitimate business need to know the information.

All information gained in the course of the investigation will be placed in an electronic file maintained and accessible only by members of the Employee Compliance department. Access to this electronic file is limited to only those with a legitimate business reason to have access to the information contained, and the information related to this matter will not be accessible to line supervisors or managers. Please remember that United Airlines policies strictly prohibit retaliation of any kind for lodging a complaint or participating in an investigation. United does not tolerate retaliation.

Sincerely,

Emilio Contreras
Supervisor -- Airport Operation

cc:     HR File
        ORDCG -- Jim Riordan

# EXHIBIT C



**UNITED**

EXHIBIT
#

February 19, 2013

Dan Loner
ORDCG
ID#192713
EIM#896720

Dear Dan:

As you know, we recently received a complaint from Lead RSW Lionell Kline that you engaged in inappropriate conduct in the workplace. Specifically, your co-worker alleged that you assaulted him when you pushed him.

United takes seriously its commitment to fair employment practices and will not tolerate inappropriate workplace behavior. In keeping with this commitment and in response to the allegations made against you, I initiated an investigation into your co-workers claim. The investigation is now complete.

United expects all employees to communicate and perform their duties in a courteous, helpful, competent, dependable and businesslike manner. All employees are also expected to treat each other with dignity and respect. In my investigation, I was unable to substantiate the allegation against you.

United Airlines policy on confidentiality regarding Company investigations applies to all parties concerned, including you and any persons contacted during the course of the investigation. The investigation should only be discussed with those persons who have a legitimate business need to know the information.

All information gained in the course of the investigation will be placed in an electronic file maintained and accessible only by members of the Employee Compliance department. Access to this electronic file is limited to only those with a legitimate business reason to have access to the information contained, and the information related to this matter will not be accessible to line supervisors or managers. Please remember that United Airlines policies strictly prohibit retaliation of any kind for lodging a complaint or participating in an investigation. United does not tolerate retaliation.

Sincerely,

Emilio Contreras
Supervisor – Airport Operation

cc:    HR File
       ORDCG – Jim Riordan

# EXHIBIT D

I am Elaine Arizmendi. I worked
For united Airlines For 16 years
Got awards For my pe Formance.
Then on JAN 2013 I was pulled
For an investigation and wrote
a statement that I saw Loner Danny
Push Lionelle Kline. Then they
Took me again For another
investigation and I was ~~Threaten~~
Intimidated and my supervisor
amillio started pushing me, and
I Felt threaten so I change
my story because I didn't ~~IF you False a Fy your Statement~~
want to lose my job. I was
pulled in Four different times
AND I told them I didn't see
anything. I kept Dening it.
Then on may 23 I got walked
oFF held Out oF service.
The the union change the story
at the hearing July 3rd and said it
was becoause oF my medication
is why I changed my story I
was stress out. they Fired me
and said because oF the honesty
policy. AND just For changing
my story. And made the
Wrong decisicion.

Elaine Magnee Q'   183370

Loner pushed Lionville when he was walking toward him.

Charge No.: 2014CF0134
Page 2 of 9

4.      On May 23, 2013, Emilio Contreras (non-Puerto Rico, Hispanic, male, non-disabled), Airport Operations Supervisor, discharged Complainant for violating Respondent's working together guidelines of honesty by making a false statement during an investigation.

## Complainant's Allegations-Counts A-D:

Complainant, a ramp service employee, alleges that she was discharged on May 23, 2013, due to her national origin, Puerto Rico **(Count A)**; ancestry, Hispanic **(Count B)**; sex, female,**(Count C)** and disability, bi-polar disorder **(Count D)**. Complainant alleges that she met Respondent's expectations. Complainant alleges that on May 23, 2013, Emilio Contreras (non-Puerto Rico, Hispanic, male, non-disabled), Airport Operations Supervisor, discharged her for violating Respondent's working together guidelines of honesty by making a false statement during an investigation. Complainant alleges that similarly situated non-Puerto Pico, non-Hispanic, male, non-disabled, were not discharged under similar circumstances.

## Respondent's Defenses-Counts A-D:

Respondent's articulated legitimate non-discriminatory reason is that Complainant was discharged due to violating Respondent's working together guidelines in that she violated Respondent's working together guidelines of honesty by making false statements during an investigation. Respondent contends that others who are not in Complainant's protected category have also been discharged.

## Investigation Summary-Counts A-D:

A.      **Complainant's Evidence.**

1.      Complainant stated that she has bi-polar disorder and Respondent was aware of her disability.

2.      **Exhibit C** is 3 pages of Dr. Timothy M. Cullinane M.D., answers to the Department's questionnaire, dated July 23, 2013, which indicates that Complainant was first diagnosed by Dr. Cullinane on July 23, 2008. Complainant's condition has included psychotic features with dissociative identity disorder. Complainant's condition can be significantly debilitating and is not transitory, with reoccurring episodes. Complainant's condition is substantial and her on-the-job activities have been restricted at times. Complainant was last treated by Dr. Cullinane on June 20, 2013.

3.      Complainant stated that Emilio Contreras (non-Puerto Rico, Hispanic, male, non-disabled), Airport Operations Supervisor, interviewed her several times regarding Lionel Kline (non-Puerto Rico, non-Hispanic, male, non-disabled), Lead Ramp Serviceman, alleging that he was pushed by Dan Loner (non-Puerto Rico, non-Hispanic, male, non-disabled), Ramp Serviceman. Complainant stated that she saw Loner push Kline. Complainant stated that Contreras kept bringing her into the office to interview her over and over again. Complainant stated that she told Contreras the truth the first time in that she saw Loner push Kline. Complainant

# EXHIBIT E

 **UNITED**

05 February 2013

# SUMMARY

## Kline/Loner

To: R. Bolanowski

Cc: J. Riordan

- On Wednesday 16 January 2013 at 1315 LRSE L. Kline approached me and asked if he could leave early because you had a doctor's appointment. I agreed and authorized ANP.
- LRSE L. Kline then made an allegation that RSE D. Loner had pushed him at gate B9 on 14 January 2013.
- I asked LRSE Kline if he was injured and he replied no but that he was very upset.
- I asked LRSE L. Kline why he waited so long to reported this alleged incident and he replied that he felt he could not trust anyone and that it would not be addressed.
- I asked if there were any witnesses, LRSE L. Kline stated that he did not know.
- I asked LRSE L. Kline to write a statement and to get a Union Steward, he replied that he had to leave because of a doctor's appointment. And that he was scheduled to be off on Thursday 17 January and Friday 18 January 2013.
- I informed LRSE L. Kline that I was off the same days and that I would meet with and interview RSE D. Loner immediately.
- LRSE L. Kline informed me that RSE D. Loner was off on Wednesday 16 January 2013.
- I then told LRSE L. Kline that we would conduct the investigation on Saturday 19 January 2013 and he agreed.
- On Saturday 19 January 2013 I received a statement from LRSE L. Kline describing that the alleged incident took place on 15 January 2013. I pointed out the date discrepancy and he changed it to14 January 2013 by writing 4 over the 5 in 15 and initialing the change. At this time he informed me that RSE E. Arizmendi had witnessed the alleged incident.

Page 1

- On Saturday 19 January 2013 a shift interview was held by me, AO Supervisor Emilio Contreras, with RSE D. Loner who was represented by IAM Steward M. Frisch and AO Supervisor Ed Cox as the scribe.
- During the interview RSE. D. Loner denied being involved in any incident with LRSE L. Kline on 14 January 2013 or at any other time.
- On 14 January 2013 RSE D. Loner was assigned to the DePaul's women's basketball team charter and was not assigned to Zone 1.


- On Saturday 19 January 2013 a shift interview was held by me, AO Supervisor Emilio Contreras, with RSE E. Arizmendi who waived union representation, AO Supervisor Ed Cox as the scribe.
- During the interview RSE E. Arizmendi stated that she saw RSE D. Loner push LRSE L. Kline.
- RSE E. Arizmendi was not sure of the date or time when the alleged incident occurred.


- On Saturday 19 January 2013 I met with LRSE L. Kline with Union Steward V. DiPiazza , AO supervisor Ed Cox was the scribe. During the interview LRSE L. Kline described the alleged incident as follows:

On 14 January 2013 at approximately 1100 LRSE L. Kline was pushed by RSE D. Loner as LRSE L. Kline was bringing an aircraft into gate B9 using the accupark lights device. LRSE Kline stated that he was pushed so hard he had difficulty keeping his balance.

- On Tuesday 30 January 2013 I received a call from Safety Supervisor F. Wyzykowski who informed me that LRSE I. Kline had filed an 1845 injury report because of the alleged incident.
- On Wednesday 30 January 2013 at 1000 I met with LRSE L. Kline and Union Steward M. Wilson to review the video for gate B9 for Monday 14 January 2013 from 0600 to 1430. The video does not show any events as described in the allegations made by LRSE L. Kline or RSE E. Arizmendi.

- LRSE L. Kline returned with Union Steward C. Edwards at 1300 on Wednesday 30 January 2013 to review the B9 video for Monday 14 January 2013. Same results as the original viewing.

- On Thursday 31 January 2013 I received a signed statement made by LRSE L. Kline that the date of the alleged incident took place on 13 January 2012 from Safety Supervisor F. Wyzykowski.

- On Sunday 03 February 2013 I met with RSE E. Arizmendi to review the B9 video for 14 January 2013 at which point she stated that LRSE L. Kline had told her the alleged incident occurred on 13 January 2013 and not 14 January 2013.

- RSE E. Arizmendi provided a statement stating the change of date of alleged incident.

- RSE D. Loner was assigned to the Delcing team on 13 january2013 and not in Zone 1.

Sincerely,

Emilio Contreras

AO Supervisor - ORDCG



On Saturday 19 January interviews were conducted by me, AO Supervisor E. Contreras as the interviewer, and AO Supervisor E. Cox as the scribe.

RSE D. Loner was represented by IAM Shop Steward M. Frisch, and you LRSE L. Kline were represented by IAM Shop Steward V. DiPiazza.

RSE E. Arizmendi waved union representation during her interview.

I reviewed the video recording for the time of the alleged incident that you stated occurred on 14 January 2013 and it does not show RSE. D. Loner at gate B9 at any time on this day.

RSE D. Loner was assigned to work the DePaul women's basketball team on 14 January 2013 for the day and was not assigned to Zone 1.

As a result of this investigation conducted by me, AO Supervisor E. Contreras, it was determined that there are no facts in evidence to support these allegations.

This matter is now closed.

Sincerely,


Emilio Contreras

Airport Operations Supervisor

| RAL OFFENSE REPORT AGO POLICE | 1. OFFENSE/INCIDENT—PRIMARY CLASSIFICATION BATTERY | | I-UCR OFF. CODE 0860 | 2. SECONDARY CLASSIFICATION SIMPLE | | | I.R.D.NO. HW-124943 | |
|---|---|---|---|---|---|---|---|---|
| 4. ADDRESS OF OCCURRENCE NO. W STREET B. 957 | | | | APT. NO. | 5. FIRE RELATED ☐1 YES ☒2 NO | 6. DATE OF OCCURRENCE—TIME DAY / MO. YR. 14 JAN 13 D690 1300 | 7. SEAT OF OCCUR. 1-651 | 8. SEAT/UNIT AE 7225 |
| 9. TYPE OF LOCATION OR PREMISE/WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE) AIRPORT | | | | C-C-A | 10. LOCATION CODE 095 | 11. DATE RD. ARRIVED—TIME 20 JAN 13 1505 | 2. ASSIGNED BY ☐1 C.O.S. ☐2 ON VIEW ☐3 SUPERVISO | |

All Information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21. NAME (LAST–FIRST–M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX–RACE–AGE CODE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL. | 27. OCCUPATION | 28. IN. JURED YES/NO | 29. VI REL. C |
|---|---|---|---|---|---|---|---|---|---|
| KLING LIONEL | ☐ | 9212 S ESSEX | M / 44 | 773 · 260 · 2840 | | | RAMP WORKER O'TO AIRLINE | | 22 |
| | ☐ | | | | | | | | |
| | ☐ | | | | | | | | |
| PARENT/GUARDIAN, IF JUVENILE | | | | | | | | | |

RACE CODES
1-BLACK 3-BLACK/HISPANIC 5-AMER. IND/ALASK.I
2-WHITE 4-WHITE-HISPANIC 6-ASIAN/PACIFIC ISLAN

OFFENDER/VICTIM RELATIONSHIP CODES

| 51. OBJECT/WEAPON ☐1 USED ☐2 DISPLAYED ☐3 UNK | 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | | | 57. IF RESIDENCE, WHERE/WERE OCCUPANTS | |
|---|---|---|---|---|---|---|---|---|---|
| IA ☐01 HAND GUN ☐02 SHOTGUN ☐03 RIFLE IX ☐04 KNIFE ☐05 VEHICLE ☐06 BLUNT INSTRUMENT ☐07 THROWN OBJECT | ☐08 EXPLOSIVE ☐09 LIQUID/GAS ☐10 BOTTLE/GLASS ☐11 RAZOR ☒12 PRY TOOL ☒13 HAND, FEET ☐14 OTHER ☐15 DNA | ☐01 CHROME/NICKEL ☐02 BLUE STEEL ☐03 SHORT BARREL ☐04 LONG BARREL ☐05 SAWED OFF ☐06 OTHER ☐07 UNKNOWN ☐08 DNA | ☐01 FRONT DOOR ☐02 REAR DOOR ☐03 WINDOW ☐04 ROOF ☐05 FLOOR ☐06 SIDE DOOR ☐07 OTHER ☐08 UNKNOWN ☐09 DNA | ☐01 FRONT DOOR ☐02 REAR DOOR ☐03 WINDOW ☐04 ROOF ☐05 FLOOR ☐06 SIDE DOOR ☐07 OTHER ☐08 UNKNOWN ☐09 DNA | ☐DNA ON PREMISE ☐1 YES ☐2 NO ALARM CIRCUMVENTED ☐1 YES ☐2 NO | ☐01 PUNCH ☐02 TORCH ☐03 EXPLOSIVE ☐04 DRILL ☐05 REMOVED | ☐06 PEEL ☐07 OPEN ☐08 UNKNOWN ☐09 DNA | ☐01 WORK ☐02 VISITING ☐03 VACATION ☐04 WEDDING ☐05 FUNERAL/WAKE | ☐06 OTHER ☐07 UNKNOWN ☐08 DNA |

58. UNUSUAL CHARACTERISTICS OF OFFENSE

59. GANG RELATED — AFFILIATION ☐ VICTIM ☐ OFFENDER

74. DESCRIBE PROPERTY IN NARRATIVE    T = TAKEN; R = RECOVERED

| | 1 MONEY | 12 JEWELRY | 62 FURS | 14 CLOTHING | 7 OFFICE EQUIPMT. | 18 TV, RADIO, STEREO | 19 HOUSEHOLD GOODS | 6 CONSUM. GOODS | 1-1 FIREARMS | 16 MISC./Gang., Drugs | 5 OTHER | 16 NONE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9A | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T $ ☐R | ☐T ☐R |

| 72. VEHICLE/TRAILER ☐STOLEN ☐THEFT FROM ☐OFFENDER'S | YEAR | MAKE | BODY STYLE/COLOR | V.I.N. | STATE LICENSE NO. | STATE EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO. # |
|---|---|---|---|---|---|---|---|---|

NARRATIVE (Do not duplicate or repeat information — for explanation or additional information only)

UNITED AIR EMPLOYEE #017616  O'HARE BADGE # 412
EVT #3302 PA 130103003, IN SUMMARY KLINE LIONELL(victim) RELATED THAT WHILE WORKING ON AIRFIELD AT ABOVE LOCATION, HE WAS SHOVED BY A CO-EMPLOYEE STATED HE WANTED INCIDENT DOCUMENTED. ADVISED SUMMONS/WARRANT VIN GIVEN.

81. SOBRIETY OF VICT ☐ SOBER ☐2
82. FLASH MESSAGE S ☐1 YES ☐2

| 81. EXTRA COPIES REQUIRED ☐ NORMAL | ☐ CONT'D. ☐ OTHER SIDE | 92. OFFICER NOTIFYING FOLLOWUP INVESTIG. UNIT | UNIT NOTIFIED | PERSON ☐NOTIFIED ☐ARRIVED | DATE (DAY-MO-YR) — | TIME |
|---|---|---|---|---|---|---|
| 93. FIRST ON SCENE | ☐ R.O. | 94. OFFICER NOTIFYING ☐LIST O/S ☐DET. ☐INV. | | PERSON ☐NOTIFIED ☐ARRIVED | DATE (DAY-MO-YR) — | TIME |

Illinois Human Rights Commission
100 W. Randolph St, Suite 5-100
Chicago, IL 60601

**CHARGE NO. 2013CA3431 – EEOC NO. 21BA31875**

**"REQUEST FOR REVIEW"**

I hereby request a review by the Commission for the following reasons:
1. The issues in this charge were not thoroughly investigated.
2. The Respondent falsified information that was not investigated.
3. Respondent denied Complainant access to the January 12, 2013 Video.
4. Investigator Stiles knowingly and willingly conspired with Hoornstra, UAL EEO Compliance Officer and Emilio Contreras to manipulate and sabotage evidence- the Video.

**RESPONSE**

**NOTE: MANY OF THE Investigator's Summary-Count A-B listed under A. Complainant's Evidence is exactly the same as her Summary from Charge N0.2013CA2200. She does NOT indicate that this is a duplication and related to a previous charge.**

A. 1. A Video was deliberately hidden by Emilio Contreras. Not only was there a Video that validates my complaint of assault by Loner; that Video shows Loner assaulting me and shows Emilio standing in the background. The investigator made no mention in her investigative report of this Video; she only made mention in her Notes that were in the file.

B. **Staff Notes from Charge N0.2012CA2200**

"Staff found that on January 12, 2012, (CORRECTION-THE INCIDENT OCCURRED ON JANARY 12, 2013) at 8:09 a.m., Loner put his hand on Complainant's back, because the light pole blocked Complainant's location."

The Video and two (2) pictures from the Video are not attached to her report. Ms. Stiles makes no mention of the fact that Robin Hoornstra Respondent's Senior Staff EEO Compliance Representative and Emilio Contreras came to her office and showed her a Video on January 21, 2014 of the assault. The Video images had been manipulated/altered. Stiles requested pictures for 1-12-12 705am,708am, 803am and 818am; her requests **were not honored and no mention of this denial is in her report**. Three days later (3) her January 24, 2014 e-mail response to Hoornstra was as follows: **(Exhibit 1 )**

"Mr. Hoornstra - The picture dated 011213 at 825am indicates:

**Kline continues walking under jet bridge -** Kline at controls (right) — wing walker (left).
When I believe it should indicate:
**Loner continue walking under jet bridge –** Kline at controls (right) — wing walker (left).
<u>Please make the change to that picture if this is correct and resend it.</u>"

Her e-mail to Hoornstra is dated January 24, 2014, 8:35AM requesting the above change.

Her Case Chronology indicates that on 010914, 932am an appointment was scheduled for 1-21-14, 10:00am **at IDHR** to meet with Hoornstra and Contreras to view a Video on his **LAPTOP** of Gate B9.

I sincerely feel that Ms. Stiles was **BIASED toward me in this investigation.** **What is the meaning of "Please make the change to that picture if this is correct and resend it? ENCOURAAGING TAMPERING WITH EVIDENCE!!**

Ms. Stiles' actions can only be interrupted as encouraging Respondent to tamper with evidence, encouraging discriminatory policies and practices; knowingly and willfully manipulate and destroy evidence that is crucial to my "charge" and defense that I was unlawfully terminated. This Video is crucial in validating my Complaint and grievance. **Ms. Styles makes NO mention of this violation of my Civil Rights in her report.** Where is the **CHAIN OF CUSTODY?** In addition, there is no mention in her report that the January 12, 2013 Video images clearly show Emilio Contreras at Gate B9; it shows Daniel Loner assaulting me. Ms. Stiles report does not indicate that Emilio Contreras falsified his testimony, denied knowing anything about the assault; it is vehemently clear that Ms. Stiles paints a perfect picture of Respondent's management discriminatory policies and practices. Ms. Stiles makes no mention of "hostile work environment, disparate treatment and racial motivation of UAL management".  I was treated differently than Loner a white man approximately 40 years old.  She granted him favor; she did not interview Loner face-to-face, she interviewed him over the telephone.  She only indicates in her report that she interviewed him, but does not indicate that the interview was done over the telephone.  In addition, she makes no mention in her report that Hoornstra and Contreras altered the Video.  It is obvious from her e-mail that they rotated my position and Loner's position to such an extent that she "asked" Hoornstra to "MAKE CHANGES TO THE PICTURE AND RESEND IT".  There was **NO evidence in the file of the original pictures that Hoornstra gave to her or a Video.  Where are those pictures?**

I am further persuaded that Investigator Styles is BIASED by her negative comments made to my Witness Elaine Arizmendi and included in Elaine's IDHR case file: Specifically – "The investigation did reveal that Loner put his hand on Kline's back. **The investigation did not reveal that Kline was assaulted by Loner. "**

Clearly, Investigator Styles vicious comments verbal and written are intimidating and harassing to Elaine.  Elaine has already been traumatized over and over again by Emilio Contreras, et al. How can Investigator Styles make such a factual comment when in fact according to her report and notes the Video had been tampered with many times.  Again, I am persuaded that Investigator Styles' is prejudiced.

In addition, I reviewed this case file recently and found more pictures that were not in the file previously. These pictures show more images of the Loner assaulting me on January 12, 2013.

Page 2

On February 19, 2013, I filed a complaint with IDHR. I was discharged after the filing of this complaint. I was accused of "falsely accusing a co-worker of assault and claiming a workplace injury"; discharged on May 30, 2013 without the benefit of a close-out hearing, stating benefits accrued during 25 years of employment or a benefit package with retirement information.

2&4. Elaine Arizmendi witnessed Loner's assault and was intimidated, harassed and terrorized by Contreras until she recanted her initial testimony. Elaine was discharge in May 2013.

The investigator made very negative comments to Elaine Arizmendi on Loner's assault. She specifically states in her report: "The investigation revealed that Respondent has a violence free workplace policy, which indicates that Respondent works at providing an environment free of threats or violence". The investigation did reveal that Loner put his hand on Kline's back. **The investigation did not reveal that Kline was assaulted by Loner. "Her racially biased attitude is obvious. On January 21, 2014, she had a meeting with Contreras and Hoornstra; she reviewed the Video; instructed Hoornstra in an e-mail how to manipulate/alter the Video and requested pictures of the changes he made. My first and second review of both files DID NOT REVEAL THE INITIAL PICTURES HOORNSTRA GAVE TO INVESTIGATOR STYLES.**

**To my knowledge, Investigator Styles did not write the Illinois Compiled Status (ILCS) which defines Assault and Battery as the following:**

### ASSAULT ILLINOIS COMPILED STATUS 720 5/12-1, 5/12-2 (8)

§5/12-1 Assault (a) A person commits an assault when without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery.

§5/12-2 Aggravated assault (a) A person commits an aggravated assault, when, in committing an assault, he:

(8) Knows the individual assaulted to be the driver, operator, employee or passenger o any transportation facility or system engaged in the business of transportation of the public for hire and the individual assaulted is then performing in such capacity or then using such public transportation as a passenger or using any area of any description designated by the transportation facility or system as a vehicle boarding, departure, or transfer location:

### BATTERY ILLINOIS COMPILED STATUS 720 5/12-3

§5/12-3 Battery (a) A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) make physical contact of an insulting or provoking nature with an individual.

    B.Respodents Evidence

1. Hoornstra 3, 4, 8&9 (See Hoornstra "8")

2. Emilio Contreras – admits that he harassed my witness Elaine Arizmendi. He falsified his statement. The January 12, 2013 Video clearly shows Emilio in the lower right corner and shows Loner approaching me. He denies knowing Loners whereabouts on January 12, 13 and 14, 2013 denies that Loner assaulted me.

Contreras my supervisor and Hoornstra, the Senior Staff EEO Compliance Representative actions are motivated by racism and clearly indicate that they intentionally violated my Civil Rights; clearly indicates that they intentionally conspired to falsify evidence to help Loner validate his statement that he did not assault me.

His February 19, 2013 letter to Loner clearly shows that not only did he know Loner pushed me, but that Loner admitted it to him. Paragraph 1, Line 1-3 "As you know, we recently received a complaint from Lead RSM Lionell Kline that you engaged in inappropriate conduct in the workplace. **Specifically, your co-worker alleged that you assaulted him when you pushed him."** (Exhibit ) In addition, Paragraph 5, states "All information gained in the course of the investigation will be placed in an electronic file maintained and accessible only by members of the Employee Compliance department. Access to this electric file is limited to only those with a legitimate business reason to have access to the information contained, and the information related to this matter will not be accessible to line supervisors or managers. Please remember that United Airlines policies strictly prohibit retaliation of any kind for lodging a complaint or participating in an investigation. United does not tolerate retaliation.

The February 27, 2013 letter from Contreras on his investigation of the Loner assault did not contain this paragraph.

---

**Response to** Charge 2013CA2200 Page 5, (B) 2. Emilio Contreras (Contreras) was a Trainer for over twenty years. He trained me when I started with UAL in 1988. He had access to computers, videos and confidential records, flight patterns that he could easily manipulate. I believe that his wife works in Customer Service. He is also a former Marine. He walked around with the US Marine Logo affixed to his radio to intimidate people in violation of Company policy. The Respondent allowed Contreras to violate Working Together Guidelines.

---

I was never given a verbal or written notice of "not meeting Respondent's expectations." In fact, Contreras had been my immediate supervisor for a few months. (I could not find any verification in this report on the length of time that Contreras had been my supervisor) In addition, I did not find a work schedule (RDO) for Elaine, Contreras and myself in this report. We all worked the same RDO.

2

---

There are no written performance evaluations or other written documents in my Personnel File. I did not find an Investigatory statement that verified Contreras allegation. Allegations of formal meetings with me are without merit. A Union Representative would be a witness to any and all such meetings. I did not find a confirmation from a Union Representative in this report. As a Union member I am entitled to have Union representation in meetings with supervisors. On January 19, 2013 at approximately 7:13AM Contreras came into the Kiosk asking for Elaine and my statement (in front of crew member Mike Bernett). When I asked him for copies of our statements and a copy of the video, he stated **"There**

**is something on the video and someone else has to look at it."** He turned and left out of the Kiosk and he never again mentioned **"What"** was on the video. It was obvious that **"something"** was on the Video that he did not want Elaine and me to see. Contreras was demanding Elaine and me to write-up statements immediately. He shouted "DO IT NOW". When we asked him for a copy of our statements he did not respond. Contreras was arrogant and rude in demanding that Elaine and I prepare statement while we were working flights. Instead of allowing us to time in a closed door area with a shop steward present. He violated our right to Union representation. On January 19, 2013, we learned that Loner who starts at 4:30AM was pulled out of service by Contreras for hours and Contreras never produced a statement from Loner.

Contreras letter to me dated February 27, 2013, does not mention any reprimands or conversations regarding my performance. Again, and again this is discrimination, harassment/retaliation, disparate treatment and creating a hostile work environment. On June 6, 2013, I sent a three (3) page response to his allegations, he never answered my letter and On May 30, 2013 at the Investigative Review Hearing, I questioned him regarding my response letter and list of witnesses and he arrogantly stated "I WILL NEVER Answer IT!". He stated this in front of three (3) Union officials.

Page 5, (B), 3.

Contreras denies that there was a Video, denies that Loner was in the area when in fact Contreras was both our supervisors. As my supervisor he should have known that I was short on crew members and that Loner was assigned by Rock (the assignment coordinator) to push an aircraft out of Gate B9. Elaine Arizmendi witnessed the assault and was threatened more than once for giving testimony that she witnessed the assault. As a member of my crew, Female, (Minority) Elaine was harassed and retaliated against for standing up and giving true testimony that she had witnessed the assault by Loner.

In addition, Line 3&4 Contreras states that on January 19, 2013, I told him that I was not injured after the assault, but changed my the date of the injury and that I was injured. I specifically told Contreras that I had a 3:30pm doctor's appointment that day, January 16, 2013 (this appointment was scheduled prior to being assaulted by Loner). That the assault had aggravated a pre-existing injury; I had been hit by a car driven by a UAL Express Pilot in July of 2012 at approximately 5:45am. That impact threw me up into the air over the roof of the car and I came crashing to the concrete in the UAL parking In fact, Frank Wyzkowski, Safety Supervisor and Ed Cox Operating Manager were at the scene of the injury for about five (5) minutes they initially put me in their vehicle then told me to get out "we got to take care of something" they left abruptly taking my personal duffle bag without giving a reason and left me leaning on a concrete pillar. In about 30 minutes Frank W returned and took me to the hospital. I was left injured and alone in the parking lot without any help. On January 19, 2013, mid-afternoon, Ed Cox Operating Manager that I gave my testimony to (Elaine gave her testimony first) regarding the Loner assault; Contreras was also present at this meeting. At the end of my statement to these men, they both agreed that this was **"definitely assault" and said "we will look into it."** Elaine's statement was given

3

without a shop steward. At the end of this meeting, I again requested a copy of my statement, my request was denied.

On January 20, 2013, I spoke to airport police in Terminal 2 regarding the Assault, they told me to ask the Company if they had made a police report. I had already notified my supervisor Contreras and Union officials, shop stewards of the Assault. After talking to airport police, I asked Ed Cox, Manager, and

another manager if they had made a police report. The responded NO! On the morning of January 21, 2013, while upstairs at Gate B9, I witnessed Daniel Loner, Jay Gegenheimer and Loners' Lead Paul Dominio walking past my Gate B9 (while Jay G was making gestures with his arms in an outward motion I then telephoned the Chicago Police Department (CPD) to the number I had been given by Airport Police on January 20, 2013. I was informed by CPD to stay by Gate B9 and that a police officer would be coming out and meet me at the Gate. Two CPD officers came out spoke to me asked where Loner was located, I said at his Gate B6. They told me to call my supervisor. I got on the radio; I called for Zone 1 supervisor to come upstairs to Gate B9; John Casper who was not my supervisor but was a Zone 2 supervisor came up. Zone 1 and Zone 2 are on the same radio frequency. The CPD officers told him that they were there to arrest Dan Loner for "Battery" to Mr. Kline. John Kasper stated with an arrogant tone that he was not my supervisor and there was an on-going investigation that he was well aware of. **Note – this was supposed to be a confidential matter and how did Kasper know about it?? (Zone 2 is located to the extreme north of Gate B9 and consists of Gates B14-B22A&B this is United Express flights-regional jets).** At this point I called Zone 1 Supervisor Robert Lewis specifically; he came up to the gate area. He told the CPD officers that he knew nothing about the Assault. Robert Lewis was my Supervisor, Contreras RDO had changed. Kasper calls Contreras who came up and spoke to the Officers and they explained that they wanted to take Loner into custody. Contreras refused to cooperate and Contreras called Jim Reardon, Ramp Manager, by this time a large crowd had gathered by my Gate B9. I asked the officers if they wanted me to point out Loner; they said NO, go down stairs and call your Union official and tell him what has happened. I went down stairs to my kiosk, called the Union spoke with Art Schwartz; I was trying to explain the situation when Mike Ciscon abruptly picked-up the phone and said "What the Hell I Hear You Got a Union Brother Arrested Right Now"; he kept screaming and yelling expletives. So much so that Elaine and Mike Burnette (sp) (my other Crew member) could hear him hollering. I told Ciscon, he assaulted me...He said Alleged Assault, he continued cussing and I hung-up the phone.

---

Respondent supposedly has a written "O" Tolerance Policy; this is not mentioned in this report. On April 25, 2013, I am unexpectedly pulled into a meeting with Contreras and Ramp Manager James Reardon, they accused me of ... "Failure to Meet the Working Together Guidelines of Honesty by: Providing false information in an investigation, falsely accusing a co-worker of assault and falsely claiming a workplace injury". No Work Injury Form 1845 was prepared by supervisor Contreras; no workers Compensation claim was filed. No workers compensation benefits were received, no medical treatment received for this alleged work injury. These are false allegations without confirmation by the Respondent. The video mentioned in the **Staff Notes shows that Loner touched me; a clear view of this video and other videos that I believe exist would show the entire Assault.**

---

There are many contradictions by Respondent and Union officials as to whether there is a Video showing the assault. The above Staff Notes is indicative of the drama surrounding the video. In addition, in the Third Step Appeal hearing on November 26, 2013, Mark Vicary, Manager, HR Airport operations and Cargo states on page 5 (attached) he states **"video footage was acquired and reviewed which again showed no pushing at Gate B9 on Jan 12**." Again my questions remains, there are more than one (1) video!

---

It is clear by these allegations that Respondent's malicious intent is to convict me of making a false medical report and making a false statement against another employee. There is a preponderance of evidence that Respondent malicious intent was to terminate me because I dared to report that I had

been assaulted by white man Loner and that I had Loner arrested. The Respondent applauds Loner with High esteem and alleges that I attempted to destroy the livelihood of a fellow worker. It is obvious by omission and commission that Respondent has a double standard and has totally excluded any feeling of justice. I was assaulted, knocked off balance in front of a moving aircraft. No mention is made of my life being in grave danger – the concern is colored only in white for Loner, but any and all evidence that sustained the truth of the assault has been manipulated and or destroyed. The Respondent's actions are so egregious that my only conclusion is that they are not only racially biased, but they refused to acknowledge the existence of a video; destroyed evidence, refused to investigate the assault in a timely manner. Furthermore, I can only conclude that the Union and Respondent conspired to create a hostile environment, prolonged the right to a hearing in a timely manner and created false information to justify the discharge.

Loner was arrested on January 21, 2013 and brought back to work three days work without a hearing. Not only was I ostracized, I was accused of falsifying my statement and terminated.

8. (Page 5) **Hoornstra**, states "that Complainant was sent to one of their doctors" That is a lie, I was never sent to their doctor for injuries sustained when Loner assaulted me. There was no accident report filed with the US Dept. of Labor, Occupational Safety and Health Administration. According to UAL Safety regulations Form 1845 must be prepared when an injury occurs. No Form 1845 was prepared by Emilio. Hoornstra further states that an "occupational injury case report dated January 29, 2013, indicated that there was no physical injury and no specific accident or injury and Complainant was still working full duty after the incident. Where are these medical records that Hoornstra alludes to?

On January 16, 2013, I had a medical appointment unrelated to the January 12, 2013 assault by Loner. My doctor suggested a MRI, Gallagher and Basset the insurance agent for UAL refused to approve the MRI. I believe that the assault by Loner activated pain from a pre-existing condition caused when I was struck by a car driven by airline pilot in the UAL employee parking lot in July 2012. Gallagher and Bassett was the insurance company for July 2012 car accident.

Hoornstra, (Page5, Item 3&4) illuminates the so-called "Working Together Policy" "all employees are to work together in cooperation free of discrimination. -...are to be truthful in their communications and avoid conflicts, refrain from aggressive or threatening behavior and fully cooperate in all of Respondent's investigations." Hoornstra actions on January 21, 2014 and January 24, 2014 demonstrate the "true" "Working Together Policy" when he willingly and knowingly falsified, manipulated, and desecrated the **Video** that he and Emilio presented to Investigator Stiles. That Video that had been in Emilio's possession since January 12, 2013 when I was assaulted by Loner. They "rotated" the Video so that the position of me and Loner in an attempt to validate Loner's testimony and to discredit me. Three white man motivated by racism plotted and falsified evidence to clear a white man of assaulting a black man. They knowingly falsified evidence that would clear my name and show that I was assaulted by Loner.

Page 7

It is unmistakably clear that, Hoornstra, Senior Staff EEO Compliance Representative planned and set about with malicious and racist intent to get me dismissed from my 25 years of being employed. It is clear that he violated my Civil Rights and violated the Working Together Guidelines over and over again.

Hoornstra, the Senior Staff EEO Compliance Representative actions are motivated by racism and clearly indicate that he intentionally violated my Civil Rights; clearly indicates that he intentionally conspired with Emilio Contreras my supervisor to falsify evidence to help Loner (White) validate his statement that he did not assault me on January 12, 1013.

He knew about this Video and he knowingly with malicious and racist intent manipulated that Video to validate Loner's lies that he did not assault me. The Senior Staff EEO Compliance Representative who claims that Respondent will not tolerate "any form of violence or threats of violence or behavior that endangers the safety of its employees or customers" has violated the Working Together Guidelines and violated my Civil Rights of fair and equal treatment. In Items 3 and 4 Hoornstra hoots and toots Respondents policy of "Working Together" .."Employees are to be truthful in their communication and avoid conflicts, refrain from aggressive or threatening behavior and fully cooperate in all of Respondent's investigations. (free of discrimination). Hoornstra the Respondent's Senior Staff EEO Compliance Representative **VIOLATED** all of these "Working Together Guidelines. He states "Respondent will not tolerate discrimination or harassment." "Hoornstra, the Senior Staff EEO Compliance Representative states that Respondent also protects employees against retaliation when they file a discrimination complaint."

Robin Hoornstra, the (55 year-old White) Senior Staff EEO Compliance Representative who purports to enforce Working Together Guidelines did viciously, maliciously, willingly, knowing and motivated by racism manipulate/alternate a Video that was crucial evidence in validating my complaint that Loner assaulted me on January 12, 2013.

5. Dan Loner lies stating that "he never touched Complainant" Lied again stating that I was pushing a plane out. The Video clearly shows that I was bringing a plane in. Investigator Styles staff notes (page 6) clearly states that **"Staff observed that the plane that Complainant was bringing in did not hesitate or stop while coming in."**

> Response – Charge 2013CA2200 Page 6, (B) 7 Dan Loner admitting he was assigned to push a plane out, contradicting Contreras statements. Loner was assigned to push the plane because no employee with the skill necessary to complete this task was available. Loner was livid with anger; he assumed that I had requested that he push the plane out!!

6. Response – Charge 2013CA2200 **Mike Cinfio**

> Page 6, (B), 9 Mike Cinifo statements that I complained of every little thing. What is every little thing? ..anything that went wrong Complainant he would be complaining." Where are Cinfio ledgers showing date and time indicating that I made unnecessary complaints? Cinfio stated that Complainant really did not have any legitimate complaints." I consider unsafe equipment to be legitimate!! These are vague and very derogatory statements. I contacted Union officials and

reported issues that were significant ;( i.e., the lack of supervisors responding to a "jet bridge that had been broken for months") creating safety concerns and unsafe working conditions-causing a hazardous work environment and extreme physical and mental stress on workers. A jet bridge that made it easier to move and load equipment. Without the jet bridge my team (E Arizmendi, Mike and myself) would have to manually walk down wheelchairs, strollers, musical instruments, golf clubs, etc. and load last minutes bags; which cause flight delays. My two member team being constantly singled out for four times the work-load as other Gates. Working back-to-back flights without any time-out breaks. Cinfio was not in our Gate area on a daily basis and cannot speak for me and my team. These are issues that the IAM Cinfio Union officials are paid to protect workers from unsafe and hazardous working conditions. When Cinfio and other Union officials refused to respond to these critical issues I called them again. Conditions that put gate B9 crew at risk of injury due to the heavy load assignments, stress and serious safety issues. Cinfio denies attending any of the hearing. In the May 30, 2013 first step grievance hearing Cinfio is listed as being present. This is another falsification of information provided in this investigation.

Cinfio stated that "he never saw a video showing Loner pushing Complainant or putting his hand on Complainant's back." Did Cinfio view any video's at all concerning this assault by Loner? This report does not make this clear.

## CONCLUSION

I have made note of the Investigators changing the tone of her Staff Note that favors the Respondent. Robin Hoornstra, the Senior Staff EEO Compliance Representative manipulates/alters Video. That Video is the most crucial piece of evidence validating my complaint that Loner assaulted me. Emilio Contreras, my supervisor conspired with Hoornstra to destroy evidence. Motivated by racism, Hoornstra and Contreras set out to alter the Video, rotate Loner's position and alter the Video even more so that my image would disappear under a light pole.

Robin Hoornstra, the Senior Staff EEO Compliance Representative who is supposed to be a "guardian" of the rights of employee is deeply immersed in a vicious plot to deny me constitutional rights and due process. Motivated by racism he set out along with his co-conspirator Emilio Contreras, (Dan Loner's supervisor and friend) to erase evidence that would prove that I was assaulted by Loner and that I DID NOT FALSELY ACCUSE LONER OF ASSAULT.

Emilio Contreras is in this Video positioned in the **"bottom"** Right Corner of this picture. Daniel Loner is pictured in the middle-left "pushing me". He lied about Loner being at work on January 12. 2013. On more than five (5) occasions he terrorized my witness Elaine Arizmendi so much so that she withdrew her original statement. He "supposedly" interviewed Loner only once. Emilio and Loner are in the Video, so why would he have to interview him! They both lied and conspired to discredit my complaint of being assaulted.

In addition, Investigator Styles requested the Respondent provide job description of Emilio Contreras and Jay Gegenheimer. These job descriptions were not provided. There is no mention of this denial in this report. Investigator Styles requested Jet-Bridge damage and repair report from September 2012 through February; these records were not provided. This denial is not mentioned in her report.

Ramp Servicemen Brian Grant (white Male) is the Lead for Gate B-12; his job is identical to mine. His information is not included in this report. I provided his name to the Investigator.

### Staff Note from Charge 2013CA3431

Staff observed video footage of January 12, 2013, January 13, 2013 and January 14, 2013, between 6:00 a.m. and 10:00a.m., when Loner allegedly pushed Complainant. Staff found that on January 12, 2013, at 8:09a.m., Loner put his hand on Complainant's back, which was partially blocked from the camera by a light pole. Staff observation indicated that the Complainant was not seen while Loner put his hand on Complainant's back, because the light pole blocked Complainant's location. Staff observed that the plane that Complainant was bringing in did not hesitate or stop while coming in.

**Staff Notes from Charge 2013CA2200**
"Staff found that on January 12, 2012, (CORRECTION-THE INCIDENT OCCURRED N JANARY 12, 2013) at 8:09 a.m., Loner put his hand on Complainant's back, because the light pole blocked Complainant's location."
**"Staff observed that the plane that Complainant was bringing in did not hesitate or stop while coming in."**

 It is explicitly clear that not only was my life in danger but that Respondents motivated by racism, maliciously attempted to cover-up this assault and attacks my character and integrity with lies and innuendos. Lifting up white man Loner and covering up my truthful account of this assault with tar and feathers and a white man lynching of a Black Man. Contreras and Hoornstra manipulated the Video, rotated the viewing angle, rotated Loner's position and moved my image behind a light pole to cover-up the assault. As stated above there were many other locations in the Gate area that had cameras and would have crisscrossed the viewing screen providing a more precise picture of the assault from all angles. There is no mention in this report that the Investigator pursued the possibility of more concrete evidence that Loner assaulted me as Contreras watched!

**Investigator has relied on information provided by Robin Hoornstra, Senior Staff EEO Compliance Representative and Emilio Contreras, Supervisor and friend of Daniel Loner. Both Hoornstra and Contreras knowingly and willingly lied, manipulated and falsified the Video presented to Investigator Stiles in her office on January 21, 2014. The manipulation of Video was such that Investigator Stiles requested in an E-Mail to Hoornstra;**

"Mr. Hoornstra - The picture dated 011213 at 825am indicates:
**Kline continues walking under jet bridge** - Kline at controls (right) – wing walker (left).
When I believe it should indicate:
**Loner continue walking under jet bridge** – Kline at controls (right) – wing walker (left).

Page 10

<u>**Please make the change to that picture if this is correct and resend it."**</u>

Her e-mail to Hoornstra is dated January 24, 2014, 8:35AM requesting the above change.

Her Case Chronology indicates that on 010914, 932are and appointment was scheduled for 1-21-14, 10:00am **at IDHR** to meet with Hoornstra and Contreras to <u>view a Video</u> on his **LAPTOP** of Gate B9.

Notably, Emilio gave me a letter dated February 27, 2013, indicating that he had investigated my complaint and found no wrongdoing by Loner. He wrote a letter to Loner dated February 19, 2013, eight (8) days before he wrote a letter to me. In Paragraph one (1), Line two (2) Emilio's admits that Loner pushed me **"Specifically, your co-worker alleged that <u>you assaulted him when you pushed him</u>".** In the third (3) paragraph, Line three and four (3&4) he states **"In my investigation, I was unable to substantiate the allegations against you."** Paragraph five (5) of this letter states: **"All information gained in the course of the investigation will be placed in an electronic file maintained and accessible only by members of the Employee Compliance department. Access to this electronic file is limited to only those with a legitimate business reason to have access to the information contained and the information related to this matter will not be accessible to line supervisors or managers."**

Emilio had possession of this Video from the day (January 12, 2013) I was assaulted by Loner. He is in the Video and has conspired with Loner and Hoornstra to deny me a right to due process. The Respondent knew of this Video denied me access to the Video and tried to cover up the fact that there was a Video.

Hoornstra's position as Senior Staff EEO Compliance Representative for United Airlines was to manipulate this Video so there were no images of Loaner assault to justify the unlawful discharge and dispute the Respondents reason for the discharge. Hoornstra and Contreras have attempted to cover-up their malicious and treacherous action by citing a biblical theology on UAL "Working Together Guidelines and"O" Tolerance. His actions are shown for exactly what they are - Motivated by hatred, discrimination and his actions are wholly related to policies and practices of discrimination and retaliation. None of the documents that Hoornstra submitted are credible. The pretext for my dismissal has no basis of fact and was solely motivated by discrimination and fueled by the fact that I had the right to file a complaint with the IDHR and file assault charges against a white man, Emilio's friend and have that white man arrested on-site for assault and battery.

Respondent states in May 30, 2013 hearing "Video footage was viewed not only on the dates Mr. Kline indicated the assault took place, January 13, or 14, but also on January 12, 2013 (Company Exhibit 10). At no time will you see any physical contact between Mr. Kline and Mr. Loner." Where is this Video? Did Investigator Stiles review this video?

Respondent knew that there were many cameras at all of the Gates and through-out Terminal One

Unfortunately, Investigator Stiles makes no mention of this letter in her "Findings and Conclusions", just as she ignores key evidence of patterns and practices of discrimination, retaliation, disparate treatment and violation of my Civil Rights. She does not define Hoornstra's duties as Senior Staff EEO Compliance Representative.

I was dismissed by the Respondent for filing charges of discrimination, harassment, retaliation, hostile work environment with IDHR.

## FACT

1. **Daniel Loner (37) white male assaulted me on January 12, 2013.**
2. **Daniel Loner (37) white male was not disciplined for assaulting me.**
3. **Daniel Loner (37) white male was not terminated for assaulting me and denying that he assaulted me.**
4. **Daniel Loner (37) white male put my life in danger violated my Civil Rights**
5. **Daniel Loner (37) white male lied, falsified his statement that He did not assault me.**
6. **Daniel Loner (37) white male received preferential treatment. HE WAS NOT FIRED**
7. **Daniel Loner (37) white male is still employed.**
8. **Daniel Loner (37) white male has suffered <u>no financial loss because he assaulted me.</u>**
9. **Daniel Loner (37) white male is still receiving medical benefits, travel benefits and retirement benefits; he received retro pay and a signing bonus.**
10. **Daniel Loner (37) white male was not required by Respondent to appear at any of the hearings.**
11. **Daniel Loner (37) white male was not required to meet with Investigator Styles face-to-face.**

### RESPONDENT'S DISCRIMATORY PATTERN AND POLICIES

**I am a 51 year old African American Male, father of five children. An U. S. Army Veteran of 5 years with an Honorable discharge. I have been employed at United Airlines for 25 years with an exemplary work record. Daniel Loner (37) white male and I were both supervised by Emilio Contreras.**

**I was discharged May 30, 2013 and "falsely accusing a co-worker of assault and claiming a workplace injury" NOT GUILTY. These allegation are false and a pretext for discriminatory practices, age discrimination, harassment, retaliation and a hostile work environment.**
**I was discharged accused of falsifying an injury report. NOT GUILTY**
**I was denied health benefits for me and my five children**
**I have been denied 401(K) retirement benefits**
**I have been denied travel benefits for me and my family**
**My family is suffering from this financially and emotionally**
**I was denied retro pay and signing bonus because Respondent Falsified evidence**
**I was denied full-vacation pay because Respondent falsified evidence**
**I have suffered financial hardship because Respondent covered-up Loners assault**

Emilio Contreras (61) white male supervisor to both Lionell Kline and Dan Loner. Contreras willingly and knowingly falsified information given to Investigator. He lied about the whereabouts of Loner on January 12, 2013. He lied that Loner was not at Gate B9 on January 12, 2013. He lied that he knew there was a Video. In fact, the video that Contreras and Hoornstra showed to Investigator Styles that was in his computer showed that on January 12, 2013, Contreras was at Gate B9 and that Loner was at Gate B9 and that Loner assaulted me. Investigator Styles E-mail to Hoornstra that was NOT included in her written report clearly states that the Video had been manipulated and altered; **images rotated in an attempt to validate Loner's lies that he did not assault me.** (Her request is stated on page 1&2 of this RESPONSE) Throughout Contreras testimony he has lied over and over again to validate Loners lies and to convict me of making false statement against Loner.

Contreras as supervisor knew there were Video cameras at every Gate, knew the procedure for getting copies of Videos, knew how to manipulate/alter images. He lied about knowing that Loner assaulted me, lied about knowing Loner's work pattern. Falsified information in the investigation and covered-up Loners assault.

Robin Hoornstra (55) white male, Senior Staff EEO Compliance Representative willingly and knowingly conspired with Emilio Contreras to destroy evidence that would validate my statement that Daniel Loner (37) white male assaulted me on January 12, 2013. Hoornstra a white man with **Unclean Hands; Hoornstra motivated by racism and a strong desire to hang me by destroying evidence; validate the discharge and free Daniel Loner (37) white man.** Hoornstra, Senior Staff EEO Compliance Representative lied over and over again; documents he provided can only be considered of no value.

Robin Hoornstra (55) white male, Senior Staff EEO Compliance Representative and Emilio Contreras (61), supervisor planned and plotted to destroy evidence and destroy my 25 year career at United Airlines. Hoornstra has worked in the airline industry for years. He came to United through the merger with Continental Airlines. He knew there was Video footage of this assault. He knew the position of cameras. He and co-conspirator Contreras set out to destroy evidence and to save Loner a white man and to destroy a Black Man by destroying evidence.

**I have been told by Respondent, white male that I endangered Loners life and he had a wife and a new baby. I am a 51 year old Black Man with 5 children, the youngest being (now) 7 years of age. At no time during any conversation with Respondent or Union officials have the welfare of my family been a topic of conversation. Yet there has been grave concern for the livelihood and welfare of this white man Loner.**

Hoornstra and Contreras violated my Civil Rights and my right to due process. Daniel Loner (41) white man was treated differently, and given privileges that I was denied.

STATE OF ILLINOIS
HUMAN RIGHTS COMMISSION

IN THE MATTER OF:                           )
                                            )
                                            )
LIONELL KLINE                               )
            COMPLAINANT,                    )        CHARGE NO.  2013C3431
                                            )            EEOC NO.    21BA31875
AND                                         )
                                            )
UNITED AIRLINES,                            )
                                            )
            RESPONDENT                       )

## **REQUEST FOR REVIEW**

REQUEST FOR REVIEW FILING DEADLINE DATE:  August 25, 2014

        I hereby request that the Department of Human Rights' (DHR) dismissal of the Charge be reviewed by the Illinois Human Rights Commission.

Complainant's Current Address

9212 S. Essex Ave Chicago, IL 60617__Phone (773)375-4103

_____

Page 14

**ORIGINAL OFFENSE REPORT**
**CHICAGO POLICE**

1. OFFENSE/PRIMARY CLASSIFICATION: BATTERY
1-UCR OFF. CODE: 0860
2. SECONDARY CLASSIFICATION: SIMPLE
3. R.D. NO.: HW-124943

4. ADDRESS OF OCCURRENCE: NO. W ST. S. 9 ST. APT. NO.
5. FIRE RELATED: ☐ YES ☒ NO
6. DATE OF OCCURRENCE - TIME: DAY NO. YR. 14 JAN 13 0900
7. BEAT OF OCCUR.: 1-651
8. BEAT/UNIT ASSIGNED: 722?

9. TYPE OF LOCATION OR PREMISE/WHERE OFFENSE OCCURRED (GIVE NAME OF LOCATION IF APPLICABLE): AIRPORT     C.C.A.
10. LOCATION CODE: 095
11. DATE RO. ARRIVED - TIME: 20 JAN 13   1505
12. ASSIGNED BY: ☐ C.O.S. ☐ 2 ON VIEW ☐ 3 SUPERVISOR

All information, descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

| 21. NAME (LAST-FIRST-M.I.) | IDENTITY VERIFIED | 22. HOME ADDRESS (NO., DIR., STREET, APT. NO.) | 23. SEX-RACE-AGE | 24. HOME PHONE | 25. BUSINESS PHONE | 26. TIME AVAIL. | 27. OCCUPATION | 28. INJURED YES-NO | 29. REL. |
|---|---|---|---|---|---|---|---|---|---|
| KLINE LIONEL | ☐ | 9212 S ESSEX | M/1 44 | 773·260·2840 | | | RAMP WORKER UTD AIRLIN | | 22 |
| | ☐ | | | | | | | | |
| | ☐ | | | | | | | | |

PARENT/GUARDIAN, IF JUVENILE

RACE CODES
1-BLACK  3-BLACK-HISPANIC  5-AMER. IND./ALASK.
2-WHITE  4-WHITE-HISPANIC  6-ASIAN/PACIFIC ISLAN

OFFENDER/VICTIM RELATIONSHIP CODES

[redacted block]

| | 37. OBJECT/WEAPON ☐ 1 USED ☐ 2 DISPLAYED ☐ 3 UNK | 52. FIREARM FEATURES | 53. POINT/ENTRY | 54. POINT/EXIT | 55. BURGLAR ALARM | 56. SAFE BURGLARY METHOD | 57. IF RESIDENCE, WHERE/WERE OCCUPANTS |
|---|---|---|---|---|---|---|---|
| IA ☐ | ☐ 01 HAND GUN ☐ 02 SHOTGUN ☐ 03 RIFLE ☐ 04 KNIFE ☐ 05 VEHICLE ☐ 06 BLUNT INSTRUMENT ☐ 07 TEARING OBJECT | ☐ 08 EXPLOSIVE ☐ 09 LIQUID/GAS ☐ 10 BOTTLE/GLASS ☐ 11 RAZOR ☐ 12 PRY TOOL ☒ 13 HAND, FEET ☐ 14 OTHER ☐ 15 DNA | ☐ 01 CHROME/NICKEL ☐ 02 BLUE STEEL ☐ 03 SHORT BARREL ☐ 04 LONG BARREL ☐ 05 SAWED OFF ☐ 06 OTHER ☐ 07 UNKNOWN ☐ 08 DNA | ☐ 01 FRONT DOOR ☐ 02 REAR DOOR ☐ 03 WINDOW ☐ 04 ROOF ☐ 05 FLOOR ☐ 06 SIDE DOOR ☐ 07 OTHER ☐ 08 UNKNOWN ☐ 09 DNA | ☐ 01 FRONT DOOR ☐ 02 REAR DOOR ☐ 03 WINDOW ☐ 04 ROOF ☐ 05 FLOOR ☐ 06 SIDE DOOR ☐ 07 OTHER ☐ 08 UNKNOWN ☐ 09 DNA | ☐ DNA ON PREMISE ☐ 1 YES ☐ 2 NO ALARM CIRCUMVENTED ☐ 1 YES ☐ 2 NO | ☐ 01 PUNCH ☐ 02 TORCH ☐ 03 EXPLOSIVE ☐ 04 DRILL ☐ 05 REMOVED ☐ 06 PEEL ☐ 07 OPEN ☐ 08 UNKNOWN ☐ 09 DNA | ☐ 01 WORK ☐ 02 VISITING ☐ 03 VACATION ☐ 04 WEDDING ☐ 05 FUNERAL/WAKE |

58. UNUSUAL CHARACTERISTICS OF OFFENSE

59. GANG RELATED – AFFILIATION
☐ VICTIM
☐ OFFENDER

74. DESCRIBE PROPERTY IN NARRATIVE       T = TAKEN; R = RECOVERED

| | 1 MONEY | 2 JEWELRY | 3 FURS | 4 CLOTHING | 5 OFFICE EQUIP. | 6 TV, RADIO, STEREO | 7 HOUSEHOLD GOODS | 8 CONSUM. GOODS | 9 FIREARMS | A Narc./Dang. Drugs | B OTHER | C NONE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ T | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ | ☐ T $ |
| ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R | ☐ R |

72. VEHICLE/TRAILER ☐ STOLEN ☐ THEFT FROM ☐ OFFENDER'S | YEAR | MAKE | BODY STYLE | COLOR | V.I.N. | STATE LICENSE NO. | STATE | EXPIR. MO/YR | 73. PROPERTY INVENTORY NO(S). | 74. VEH. INVENTORY NO.

NARRATIVE (Do not duplicate or repeat information – for explanation or additional information only):

EV#T09302  PA#130103003. IN SUMMARY KLINE LIONEL (VICTIM) RELATED THAT WHILE WORKING ON AIRFIELD AT ABOVE LOCATION, HE WAS SHOVED BY A CO-EMPLOYEE. STATED HE WANTED INCIDENT DOCUMENTED. ADVISED SUMMONS WARRANT VIN GIVEN.

UNITED AIR EMPLOYEE #017616    O'HARE BADGE #412
Victim

80. SOBRIETY OF VICTIM: ☐ SOBER ☐ 2
81. FLASH MESSAGE: ☐ YES ☐ 2

91. EXTRA COPIES REQUIRED ☐ NORMAL ☐ CONT'D. OTHER SIDE ☐ R.O.
92. OFFICER NOTIFYING FOR FOLLOW-UP INVESTIG. UNIT | UNIT NOTIFIED | PERSON ☐ NOTIFIED ☐ ARRIVED | DATE (DAY-MO-YR) | TIME
93. FIRST OFFICER AT SCENE
94. OFFICER NOTIFYING ☐ 1ST D/S ☐ DET. ☐ M.E. | PERSON ☐ NOTIFIED ☐ ARRIVED | DATE (DAY-MO-YR) | TIME
95. REPORTING OFFICER'S NAME (PRINT): MUSICK? | STAR NO. 93. | OFFICER'S SIGNATURE | DATE INVEST. COMPLETED - TIME | 97. SUPERVISOR APPROVING (PRINT NAME)

UAL-B9 - 1/12/2013 8:09:03 AM

Kline obscured by light pole – Loner with outstretched arm beside him – Contreras (right side)

**UNITED**                                             A STAR ALLIANCE MEMBER

January 09, 2007

Dear Mr. Kline:

This letter is in response to the complaint you brought forward on 11/28/06 of being assaulted by supervisor Jay Gegenheimer on 11/16/06. Specifically, you complained that you were pushed in the back by Supervisor Gegenheimer.

Based on the information you provided us in our discussion, we conducted a thorough investigation into your complaint. We interviewed those individuals who were identified as possible witnesses as well as the accused and yourself.

The information gathered in our investigation confirmed that Mr. Gegenheimer did touch you. However, not in a manner that would be considered an assault. The evidence revealed that Mr. Gegenheimer touched you in a normal manner with the intent of getting your attention with no malicious intent.

Finally, I remind you that United does not tolerate retaliation from anyone against an employee for filing a complaint or for participating in an investigation. If you believe you are experiencing retaliation in any form, please contact me immediately.

Sincerely,

Jim Riordan
Operating Manager-ORDCG

cc: Jim Grabowski
    Marc Abbatacola
    Rick Bolanowski

World Headquarters   1200 East Algonquin Road   Elk Grove Township, Illinois 60007   Mailing Address: Box 66100, Chicago, Illinois 60666